141 So.2d 101 (1962)
Edward O. GRAYSON, Appellant,
v.
ALLSTATE INSURANCE COMPANY and Hardware Mutual Casualty Company, Appellees.
No. 5542.
Court of Appeal of Louisiana, First Circuit.
April 23, 1962.
Davis, Clesi & Fink, by Lonnie A. Davis, Baton Rouge, for appellant.
Taylor, Porter, Brooks, Fuller & Phillips, by Robert Vandaworker, Kennon, White & Odom, by John S. White, Jr., Baton Rouge, for appellees.
Before ELLIS, HERGET and MILLER, JJ.
HERGET, Judge.
Plaintiff, Edward O. Grayson, prosecutes this appeal from an adverse judgment of the trial Court rejecting his demands for personal injuries allegedly sustained in an automobile accident which occurred Sunday, May 22, 1960 on the Rosedale Road in West Baton Rouge Parish, Louisiana. The accident resulted when Mrs. Gordon Raborn, who was driving a vehicle owned *102 by Chester L. Grayson, Plaintiff's son, lost control of the automobile and turned over in the highway, injuring Plaintiff, who was a passenger in the front seat.
Plaintiff joined Allstate Insurance Company and Hardware Mutual Casualty Company (erroneously referred to in the petition as "Hardware Mutual Insurance Company") as parties defendant on allegations that both were insurers of the vehicle owned by Chester L. Grayson. Both Defendants deny coverage to the driver of the automobile and, alternatively, contend that Plaintiff was guilty of contributory negligence in assuming the risk of injury by riding with an operator of a vehicle who was obviously under the influence of intoxicating beverages and driving the vehicle in an erratic and reckless manner prior to the accident.
The record reveals that Mr. and Mrs. Gordon Raborn of Baton Rouge were interested in purchasing an automobile owned by Plaintiff's son, the same automobile that was involved in the accident. Certain negotiations had been conducted toward the sale on a Friday preceding the date of the accident. On Sunday morning, according to the Plaintiff, he first contacted the Raborns by visitation at their home about 10 o'clock. At that time the Raborns were cooking a barbecue. Mr. Grayson had driven to the Raborn home in his own vehicle and apparently Mr. and Mrs. Raborn accompanied him to his home to pick up the son's vehicle. Chester Grayson, the owner of the vehicle, was asleep and the parties returned to the Raborn home where they finished cooking the barbecue and ate. According to Plaintiff's testimony Mr. Raborn on this occasion drank one beer; he did not see Mrs. Raborn drink anything and he, himself, refused to imbibe as, he stated, "it was a little early." Some question arose as to the balance owed by young Grayson on the vehicle so all the parties returned to the Grayson house, apparently ascertained the balance due and at approximately 11:30 a. m. concluded to drive across the Mississippi River to the Crocodile Inn located on the Rosedale Road for the purpose of testing the vehicle and for the added pleasure of consuming some crustacean delights known in Louisiana as "Crawfish". The party, with Mrs. Raborn driving, arrived at Crocodile Inn around 12:30 or 1 p. m. Despite their expressed intention of going to this inn for the purpose of eating crayfish, upon being apprised Crocodile Inn had no crayfish or that they were sold out but a man down the road had some, according to Plaintiff the parties remained at Crocodile Inn notwithstanding this information for two or three hours additional time during which period he watched some people engaged in fishing, talked to people and he had one beer with a friend whom he met there. He testified that during this period he did not believe Mrs. Raborn had any intoxicating drinks at all but if she did he did not see her. The parties decided finally to continue their quest for the crayfish and drove some two and a half or three miles to a location of the other vendor of crayfish recommended by the proprietors of Crocodile Inn. On their arrival there they were disappointed to find that neither did he have any crayfish and, though given this information on their arrival, the parties tarried at this point for some thirty or forty minutes before leaving about 6 p. m. to return to Baton Rouge. Shortly thereafter, with Mrs. Raborn driving, the ill-fated accident occurred approximately one and a half miles east of the Crocodile Inn. Plaintiff testified that Mrs. Raborn appeared to have perfect control of the car prior to the accident but without warning, "Well, we had gone right along talking and all at once the car swayed over off the curb and then when we came back it went into a loop and that's the last thing I remember. It knocked me out." He further related that there was no reason to warn Mrs. Raborn of her driving for she was handling the car properly.
Plaintiff's version of the accident is contradicted by Mr. John R. White, Sr., an eye witness to the accident who was driving behind the vehicle operated by Mrs. Raborn. *103 Mr. White was of the opinion that the Raborn vehicle had been parked in the vicinity of the Crocodile Inn a short time before the accident. He described what he saw as follows:
"A Yes, I was directly behind the car when the accident happened.
* * * * * *
"A * * * As I approached this car, the car apparentlyseemed to me it was parked and as I approached it from a distance of several hundred feet, they started up. The car started up in an excessive manner as to throw gravel and everything on the road. I attempted to pass the car and they refused to let me pass. I made a second attempt to pass and they refused to let me pass, so I assumed that it would be dangerous to attempt to pass them any more.
"Q You say they wouldn't let you pass. What would the car do when you would try to pass?
"A As I would draw almost abreast of the car, the car would speed up and pass me and weave from one side of the road to the other. Then we noticed objects being thrown from the car, bottles and cans, and we assumed that the driver of that car was not in full control of his facilities so we deemed it safer to stay behind the car.
"Q Now, approximately how fast were you traveling at the time this car was involved in this accident?
"A Between forty and fifty miles an hour.
"Q And that car was staying ahead of you on the road?
"A Consistently.
"Q Now, how far did you follow the car from the time it first pulled onto the road that you were traveling on ahead of you?
"A Oh, I would say, rough memory, approximately a mile or a mile and a half.
"Q During that entire distance was the action of that car as you have described it here, speeding up and slowing down and weaving from one side of the road to the other?
"A It was very erratic. The car was from one side of the highway to the other. It was impossible to pass it without becoming involved in a wreck.
* * * * * *
"Q Now, Mr. White, what happened when this car had its accident? Can you describe what happened there?
"A Well, sir, the car was proceeding ahead of me, as I previously testified, in a very erratic manner from one side of the highway to the other, and the car seemed to get off the shoulder on the righthand side and pulling over. It was my opinion that the driver pulled over too hard, and the car began to roll and tumble on its side down the highway, and when it stopped, it was resting with the wheels in the air and the bottom down, completely blocking the highway. I was close enough to hear a woman scream. I stopped my car at about a hundred or so feet behind it because I was afraid of fire, and my wife and her mother were very excited too because of fire. I jumped out of my car and ran up to see if I could give any assistance, and others were arriving at the time, so I volunteered to turn around and go back and ring for an ambulance, while the other people that were congregating were rendering first-aid assistance.
* * * * * *
"Q As you approached the car, it dug out as the teenagers say, and proceeded down the road ahead of you?
"A That is correct, yes, sir.

*104 "Q Was it weaving from one side of the road to the other from that time until the accident actually occurred?
"A Well, my speed at the time that car started was such that I could have easily passed the car, but as I would approach the car and get just about even with the rear end of the car, well, the car would speed up and pull over forcing me to drop back. It did
that twice and then we realized that there was a possibility that the driver was not in full control of all of his facilities, so we stayed behind."
On cross-examination Mr. White observed that from previous experience of driving behind people who were drunk, the manner the vehicle was being operated in which Plaintiff was riding was very similar, and in response to these queries about road testing the automobile, he replied:
"Q Isn't it possible that Mrs. Raborn who was driver of this automobile was putting it through various maneuvers in order to test a car that she wasn't familiar with?
"A That would not be my way of testing a car, to go from one side of the highway to the other, no, sir.
"Q Did she stop or slow down and then speed up?
"A Yes.
"Q That would be a way of testing a car, wouldn't it, acceleration and deceleration?
"A If you were driving it on the proper side and proper lane of the highway but not on both sides of the highway.
"Q Is it your testimony that she went from one side of the highway to the other?
"A Correct.
"Q How many times did she do that?
"A The exact number I could not state."
He further related:
"Q You stated that you noticed bottles and cans come out of the car. How many did you notice?
"A I noticed one bottle and several cans thrown out of the car, thrown out on the driver's side."
Accompanying Mr. White as passengers in his automobile at the time of this accident were his mother-in-law and his wife. He testified that his mother-in-law was too aged and infirm to be a witness and, by stipulation of all parties, it was agreed that if Mrs. White were called to testify for the Defendants, she would testify to the same facts described by her husband, Mr. White.
Trooper Joe Anselmo of the Louisiana State Police testified that he arrived at the scene of the accident about 6:30 and that he ascertained the accident had occurred at about 6:15 p. m. His investigation indicated the cause of the accident was:
"A My cause of the accident is losing control of the car where she ran off the shoulder of the road.
"Q It is your opinion then that this accident was caused solely by her losing control of the automobile?
"A I don't know what caused her to lose control, but that's what happened.
"Q Was there any evidence of drinking at the time?
"A Yes, sir.
"Q Did you learn or were you able to learn whether or not the person was intoxicated?
"A No, sir.
"Q You say, `no, sir,' would you say then that she was not intoxicated?
"A I couldn't tell whether she was intoxicated or not. She stated to me *105 that she had not been drinking, but there was the smell of alcohol all over the place."
Trooper Anselmo did not charge Mrs. Raborn with driving while under the influence of an intoxicant, giving as his reason all of the occupants of the automobile were seriously injured and it was difficult to tell which of the occupants of the automobile were intoxicated. He related that all of the occupants smelled of alcohol and "* * * The car even smelled like it. I couldn't tell who was drinking and who wasn't."
Plaintiff was taken to Our Lady of the Lake Hospital where he was examined by Dr. Moss M. Bannerman who made the following observations while a witness:
"Q Doctor, at the initial examination of Mr. Grayson at the hospital immediately following the accident, did you likewise have occasion to examine Mrs. Raborn?
"A Yes, sir.
"Q Are you in a position to give an opinion as to whether or not she was in an intoxicated condition?
"A No, sir.
"Q Do you know whether or not she had been drinking?
"A Without my record, I would not. I see a note on Mr. Grayson's record here that it was noted that he had been drinking. My impression, going back that far, is onlyamounts to about hearsay, but it was my impression that there was an order of alcohol about all three of the people involved.
"Q May I ask you this, doctor, if she would have been in such a state to where she would have been intoxicated, it would have been obvious to all parties. Would you have made a note to that effect on your medical records?
"A If at the time I saw her, she was not cooperative, and I felt it was the result of intoxication, I would so note.
"Q But such was not the case here?
"A I do notI recall examining her. At the time I examined her some several hours after the accident, she seemed reasonably cooperative, and her degree of intoxication did not seem excessive.
"Q Well, put another way, does that mean that she had been drinking?
"A I think that she had. I think, as I say, I don't have her record here, but I think that she had been drinking previously, yes."
Plaintiff and Mr. and Mrs. Raborn were together almost constantly from about 10 a. m. until shortly before 6 p. m. when the accident occurred. Plaintiff claims in that period he consumed only one bottle of beer and he did not recall that Mrs. Raborn had a single drink during the entire day. Yet the parties spent about half of the day in one bar and at least half an hour in another. Plaintiff gave no explanation of the content of the cans and bottle that were thrown from the driver's side of the vehicle immediately before the accident, testified to by Mr. White. The State Trooper who observed Plaintiff and the Raborns immediately following the accident stated that he noticed a strong odor of alcohol on investigating the case. The physician who examined the occupants of the car several hours later stated he detected an odor of alcohol on Plaintiff and Mrs. Raborn. In the light of such testimony it is impossible to believe Plaintiff's testimony that he consumed one beer and Mrs. Raborn did not drink that day to his knowledge.
Though the burden of proof rests upon Defendants to prove the facts as to Plaintiff being guilty of contributory negligence, conceivably Mr. and Mrs. Raborn might have been able to explain the inconsistencies in Plaintiff's story. However, Plaintiff did not choose to call them as his witnesses nor did he attempt to give any explanation as to why they were not called, *106 except to maintain that Defendants failed to prove his contributory negligence. We are compelled to conclude that their testimony, if it had been heard, would have been adverse to Plaintiff. The law of Louisiana is well settled on this point. Prince v. Liberty Mutual Insurance Company, La.App., 106 So.2d 736 and cases cited therein.
Plaintiff further maintains that even if Mrs. Raborn had been drinking, there is no evidence that he had knowledge that she was not in command of her faculties sufficiently to control the vehicle. In the light of Mr. White's testimony that the automobile in which Plaintiff was riding was weaving erratically from one side of the road to the other for at least a mile and a half prior to the accident, such erratic driving was sufficient in itself to notify Plaintiff of the peril in riding with Mrs. Raborn. In either event, Plaintiff is guilty of contributory negligence in assuming the risk of riding with Mrs. Raborn operating the vehicle.
In Otis v. New Orleans Public Service, Inc., La.App., 127 So.2d 197, the Court of Appeal for the Fourth Circuit stated:
"It is well settled in our jurisprudence that a guest passenger cannot recover for injuries received as a result of his driver's negligence where that driver has had a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties and cause such faculties to be materially impaired and where the guest passenger knew or should have known of the driver's condition and yet voluntarily rode with him. Dowden v. Bankers Fire & Marine Ins. Co., La.App., 124 So.2d 254; McAllister v. Travelers Ins. Co., La.App., 121 So.2d 283; Lyell v. United States Fidelity & Guaranty Co., La.App., 117 So.2d 290; Woods v. King, La.App., 115 So.2d 232; Elba v. Thomas, La.App., 59 So.2d 732.
"* * * Under our more recent jurisprudence as set forth in the cited cases, it is no longer necessary to show that the driver was drunk. The fact that he had a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties and cause such faculties to be materially impaired is sufficient. We therefore hold that the action of a guest passenger in voluntarily riding with a driver under the influence of intoxicants to an extent sufficient to make him lose normal control of his mental and physical faculties and to cause such faculties to be materially impaired, whose condition was known or should have been known to the guest passenger, constitutes not only an assumption of the risk in any claim against his host but also independent, contributory negligence sufficient to bar his recovery from third persons in any case where the host driver was guilty of negligence which was a proximate cause of the accident.
"We are of the opinion that the plaintiff was guilty of further independent negligence, which by itself would bar his recovery, in failing to discharge his duty as a guest passenger in the exercise of ordinary care to protest, observe and warn. See Aaron v. Martin, 188 La. 371, 177 So. 242; Clifton v. Dean, La.App., 169 So. 788. However, it is unnecessary to go into this feature of the case. To do so could lead only to the same conclusion already reached on what we feel are ample grounds."
In the recent case of McAllister v. Travelers Insurance Co., La.App., 121 So.2d 283, this Court had occasion to review the jurisprudence of Louisiana on the culpability of guest passengers of an intoxicated driver, we observed:
"It is the settled jurisprudence of this state that the intoxication of a motorist who collides with a stationary object while driving under the influence of alcoholic beverages, constitutes a proximate cause of such an accident where, in the light of all the facts and circumstances surrounding the incident, it may *107 reasonably be inferred that the accident would not have occurred except for such intoxication and that the intoxication was one of the contributing factors of the accident."
Assuming arguendo that Plaintiff was not aware of Mrs. Raborn's intoxication; even assuming further Mrs. Raborn was not inebriated; nevertheless it should have been quite apparent to Plaintiff that Mrs. Raborn had lost normal control of the vehicle and was driving in a most erratic manner prior to the accident and such an accident as did happen was almost inevitable.
In Aaron v. Martin, 188 La. 371, 177 So. 242, it was stated:
"* * * As was said by this court in Delaune v. Breaux, (174 La. 43, 139 So. 753, 755) supra:
"`A guest * * * must exercise reasonable care and diligence to protect himself by making it possible for the driver to avoid an accident.'
"In Lorance v. Smith, (173 La. 883, 138 So. 871, 876) supra, we said:
"`A guest or a gratuitous passenger in a motor vehicle cannot recover for injuries due to the negligence of his host if he is aware of and acquiesces in the negligence.'
"In that case we quoted approvingly the following from 42 C.J. 1170, § 948:
"`(But an occupant of a motor vehicle may not) abandon the exercise of his own faculties and intrust his safety absolutely to the driver, regardless of the imminence of danger, or the visible lack of ordinary care on the part of the driver to avoid all harm. If he fails to use ordinary care, including the exercise of his own senses of sight, hearing and perception, to protect himself under such circumstances, he is guilty of contributory negligence.'"
In Clifton v. Dean, La.App., 169 So. 788, plaintiff was riding as a guest passenger in a truck which was equipped with an improvised windshield of cardboard with a hole about 4 × 6 inches cut in it which afforded the driver his only vision. The Court stated:
"* * * He sat behind the same improvised windshield as did the driver, and was bound to know the latter's vision was further impaired because of the small hole through which it was limited. With full knowledge of all these unusual conditions and the extra hazard involved in driving during these dark hours of the morning, he nevertheless permitted the driver to go on at a dangerous rate of speed and never uttered a word of protest. This court has held that a guest passenger in an automobile is not required to keep a constant lookout for the dangers of the road incident to automobile driving and that he has the right to rely to a reasonable extent on the exercise of the proper duty of care by the driver in charge of the car. This does not mean, however, that he can lightly abandon all care and throw all precaution to the wind. When unusual circumstances present themselves and the danger of driving increases, he is held to the exercise of greater prudence for his own safety and of at least protesting against any carelessness or negligence on the part of the driver. The plaintiff Clifton, having failed in the observance of this precaution, if indeed he did not acquiesce in the driver's negligence, makes him equally guilty of contributory negligence, and he is not entitled to recover."
Plaintiff, in defense of his actions, relies upon the decision of the Court of Appeal of Orleans in Warner v. Home Indemnity Company, La.App., 123 So.2d 518, in which it was held that Plaintiff was not negligent in riding as a passenger with a driver who had been drinking, to her knowledge, prior *108 to the accident. However, the Court therein observed:
"A careful examination of the record convinces us that the trial judge's conclusion was correct. In fact we believe the evidence preponderates to the effect that Louviere while concededly grossly negligent, was not rendered incapable of operating an automobile as a result of excessive drinking so as to enable the ordinary reasonable and prudent passenger an opportunity to detect the semblance of any incapacity; therefore, plaintiff was not negligent in riding with him as a passenger."
The Court further made observation in the Warner case that the plaintiff had no prior warning or reason to believe that a collision with a parked car was imminent or that the driver was not fully possessed of his faculties. Factually, the circumstances existing in that case are diametrically opposed to those which we find to exist here, for here, from an obviously disinterested witness, Mr. White, it is shown that for some mile and a half prior to the accident Mrs. Raborn was driving the vehicle in which Plaintiff was a passenger in a most erratic manner, going from one side of the road to the other several times; slowing down and accelerating with no apparent reason; and driving in such a manner that her actions should have been amply sufficient to warn Plaintiff of the peril to which he was being subjected and of the grave possibility of an impending accident.
The Trial Judge in his reasons for judgment expressed the view that Plaintiff did not truthfully describe the intoxicated condition of Mrs. Raborn or the reckless and erratic manner in which she was driving the vehicle and found "* * * that she must have been pretty well loaded, and I think that she drove down the road in such a reckless and dangerous manner that it was contributory negligence for him to stay in that automobile with her without making any protest whatsoever."
Inasmuch as we are of the opinion that Defendants have sustained the burden of proving Plaintiff's contributory negligence, it is unnecessary for us to discuss the alternative defenses raised.
For the reasons assigned, the judgment of the Lower Court is affirmed.
Affirmed.